No. 176　　　　　March 11, 2026　　　　　567

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of S. A. N.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. N.,
*Appellant.*

Klamath County Circuit Court
23JU02761; A187934 (Control)

In the Matter of M. M. N.-G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. N.,
*Appellant.*

Klamath County Circuit Court
23JU02763; A187935

In the Matter of D. J. N.-G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. N.,
*Appellant.*

Klamath County Circuit Court
23JU02765; A187936

Andrea M. Janney, Judge.

Submitted December 17, 2025.

G. Aron Perez-Selsky filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Interim Deputy Attorney General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

## ORTEGA, P. J.

In this juvenile dependency proceeding, mother appeals judgments establishing durable guardianships for her three children, S, D, and M. Because the children are eligible and enrolled members of the Klamath Tribes, this case is governed by the federal Indian Child Welfare Act (ICWA), and the Oregon Indian Child Welfare Act (ORICWA). *See* Indian Child Welfare Act of 1978, 25 USC §§ 1901 - 1963; Oregon Indian Child Welfare Act, Or Laws 2020, ch 14, §§ 1 - 66 (Spec Sess 1) (codifying new provisions at ORS chapter 419B.600 to ORS 419B.665 and amending portions of ORS chapters 350, 418, 419A, and 419B). Mother argues that the Oregon Department of Human Services (ODHS) failed to prove, by clear and convincing evidence, that it is likely that the children will suffer "serious emotional or physical damage" if returned to her custody or that the children could not be safely returned to mother within a reasonable time. Because we conclude that clear and convincing evidence supports those findings, we affirm the judgments.

In this case, mother has not requested *de novo* review, and we conclude that this is not an exceptional case warranting such review. ORS 19.415(3)(b); ORAP 5.40(8)(c). Thus, we are bound by the juvenile court's "explicit and implicit findings of historical fact if there is any evidence in the record to support them." *Dept. of Human Resources v. K. C. W.*, 347 Or App 425, 430, ___ P3d ___ (2026). We summarize the facts in accordance with that standard.

In June 2023, ODHS took the three children in this case into protective custody, following mother's arrest in May for driving while intoxicated while the children were in the car with her. During the arrest, mother assaulted one of the officers in view of the children. At that time, S was nine years old, D was six years old, and M was four years old. The children were placed into substitute care with a maternal relative, Weiser, who is also a member of the Klamath Tribes. In June 2023, mother was again arrested for driving while intoxicated, among other offenses. Mother was later convicted of offenses related to both the May and June incidents. At the time of the children's removal, mother was struggling with substance use, particularly alcohol use.

In August 2023, the juvenile court took jurisdiction over each of the three children based on the following proven allegations that pertain to mother:

"A.   The mother * * * has a substance abuse problem which is not ameliorated and hinders her ability to adequately and appropriately parent and protect the child. This condition places the child under a threat of harm.

"B.   The mother * * * does not understand the needs of the child and lacks the parenting skills necessary to adequately and appropriately parent and protect the child. This condition places the child under a threat of harm.

"C.   The mother * * * assaulted another adult which occurred in the presence of the child. This condition places the child under a threat of harm.

"D.   The mother * * * has been subjected to domestic violence by [the father of D and M] some of which has occurred in the presence of the child. This condition places the child under a threat of harm."

Also in August 2023, mother completed a 30-day inpatient drug and alcohol treatment and started outpatient treatment. After a relapse in late October, which involved mother drinking until she passed out, mother completed a second inpatient treatment program. She was diagnosed with severe alcohol use disorder and severe cannabis use disorder. Mother also began, but did not complete, classes in hands-on parenting, anger management, and outpatient substance use treatment. She attended supervised visits with the children that went well, but in April 2024, mother disengaged from all services and, after several occasions when she failed to call or appear for visits, ODHS removed her from the visitation schedule in July 2024. In August 2024, the court changed the children's permanency plans from reunification with mother to guardianship. And, in November, ODHS moved to establish a durable guardianship for each child, under ORS 419B.366, with Weiser as the guardian. The court held a hearing on the motions in May 2025, about two years after the children were placed in Weiser's care.

At the time of the hearing, mother resided in Portland where she had been since late October 2024 after

serving some jail time, while the children and Weiser remained in Klamath County. After her release from jail, mother started substance abuse treatment with Native American Rehabilitation Association (NARA). She completed residential treatment in February 2025, and, two days before the guardianship hearing in May 2025, she completed outpatient treatment while staying in transitional housing. NARA confirmed through urinalysis testing that mother had maintained her sobriety since October 29, 2024, and mother testified that she had been sober since she was in jail, for a total of nine months. Mother's counselor at NARA testified that mother had maintained sobriety and had community support to help her keep sober.

While in residential treatment at NARA, mother also completed "positive Indian parenting," which required compliance with treatment, completing three steps of Alcoholics Anonymous or Wellbriety, completing a relapse prevention plan, and attending all groups. Mother also completed anger management through NARA. Mother is no longer with father of D and M, and ODHS has no knowledge of mother experiencing domestic violence since then. Mother also testified that she is an active member at Painted Horse Recovery and that she is engaged in cultural activities. She currently is in transitional housing that does not allow children, but she contacted Native American Youth and Family Services (NAYA) in Portland, and she testified that they could take her and the children in one to two days.

After completing residential treatment, in March 2025, mother began having weekly half-hour video calls with the children. Her first in-person visit with the children since April 2024 occurred on April 18, 2025, about a month before the guardianship hearing, and she later saw the children, accompanied by Weiser, at a different time at a powwow. ODHS offered mother additional visits in Klamath County, along with lodging, on two other dates in early May 2025, but she did not respond. Mother also cancelled a planned visit with the children for a Mother's Day powwow. However, mother did have another in-person visit with S and M, which D was unable to attend, while she was in town for the guardianship hearing. It is undisputed that mother has a bond

with the children and that she does well with the children during visits. However, S has reported that mother places some of the parenting responsibilities on her during visits.

The children have been doing well in Weiser's care. Weiser has connected the children to tribal culture, to other tribal members, and to family. They have become more confident, are doing well in school, and are happy. S is learning to be a kid and not the parent, and D is learning how to cope with his emotions. The children have a well-established support system in their current placement with school, therapy, family ties, friends, culture, and community. The ups and downs of the case have caused them anxiety. Weiser testified that the children have been excited to visit their parents and were depressed when their parents did not show and hurt when the frequency of visitation decreased. S expressed to Weiser that she did not want to go home with mother and wanted to stay with Weiser.

All three children were also attending individual therapy, and all three have been diagnosed with an adjustment disorder. At the time of the hearing, D had been seeing his therapist for five months and was working on addressing his emotional dysregulation, emotional awareness, and appropriate coping skills to express his emotions safely. D had been expressing emotion with aggressive physical and verbal behavior and engaged in self-harming behavior when frustrated. His therapist reported that D was improving but that a change in placement could result in regression to aggression or emotional dysregulation. D expressed in therapy that he appreciates the cultural connection he has, that he loves mother and wants to reconnect, but that he wanted to do that through visits, while staying in his current living situation.

Both S and M have been with the same therapist for three months. M is working on displaying the full range of emotions without a loss of control. S has struggled with honesty and with taking on a parenting role as she feels strongly that she needs to be in charge of her siblings and that her parents expected that of her. S has shown a lot of improvement with self-esteem, sharing her feelings, and trying new things. The therapist testified that both children

needed consistent routine and rules to feel safe. S experiences anxiety around visits with mother but enjoys seeing her; however, S is concerned about things going back to how they were before she was placed with Weiser and expressed that she wants to stay with Weiser. M loves mother and is happy to see her. The children's therapist also testified that a change in placement would risk setting them back to the beginning of therapy with emotional and behavioral problems and academic difficulties if they were to change schools.

The ODHS caseworker for the family, Warnstaff, testified that S is "really skeptical" of going home with mother, that she struggles with that relationship and with trust, and that she is fearful of mother finding out how she feels. S has been firm in wanting to stay with Weiser. Warnstaff further testified that the children need a caregiver that understands their needs and puts them first, and who is able to cooperate and communicate with their support system, and that it would be a detriment to the children to lose the tribal connection that they now have. Warnstaff testified that she has concerns that mother "still lacks the parenting skills and understanding of what the children's needs are ongoing as evidence[d] by her not attending the visitation that was offered to her and then not attending the OIT [Oregon Institute of Technology] relationship [program]."

Warnstaff also testified that mother "continues to struggle to control her emotion and aggressive behaviors" and "to take accountability for her behaviors, interactions, and emotions and [to] understand how they impact her children." For example, a courtesy caseworker, Kilkenny, reported that after the April visit with the children, mother became emotional and then angry and aggressive to Kilkenny about a conversation Kilkenny had with Weiser when they dropped off the children. Mother expressed that Kilkenny was "supposed to be" on her side and demanded that Kilkenny not talk to Weiser. Warnstaff testified that the biggest barrier to mother being a safe parent is her behavior, and that she lacks the skills to safely parent. In a meeting the day before the guardianship hearing, mother told Warnstaff that she was not planning on participating in mental health services.

Warnstaff opined that the children cannot be safely returned to mother until she makes further progress in her behavior and engages in hands-on parenting services.

The Klamath Tribes representative and qualified expert witness, Ruiz, testified that, although mother had made progress, it would be detrimental to the children for them to go home with her. She was concerned about mother's unwillingness to cooperate, her tendency to manage anger poorly, and her unwillingness to engage in mental health services. Prior to the hearing, Ruiz had anticipated that she would ask the court to give mother more time, but after mother arrived late to the hearing and after listening to the testimony, the tribe's position was that the children could not safely return to mother within a reasonable time.

Mother objected to the guardianships based on the services she completed, arguing that she had family and community in Painted Horse and Wellbriety that would support her and the children and expressing a concern that Weiser is not physically capable of taking care of the children. She also testified that she disagreed with ODHS that she was aggressive or did not have control of her anger, arguing that it was a matter of perception. She also denied being aggressive with Kilkenny and expressed that she had been treated unfairly. She also testified that she would address the children's transition to Portland with family counseling through NAYA, which she was "pretty sure" would happen immediately, and would "just be[] active in their school adventures." When asked, mother could not identify what school the children would attend in Portland, because she did not know in which house NAYA would place her and the children.

The juvenile court, in establishing the guardianships for the children, made several findings. The court remarked that mother's engagement has been a roller coaster, that she was blaming other people, "throwing out random ideas" and "making stuff up," and that she had no real plan for the children. The court also found that mother was staying clean and sober through structured inpatient and structured outpatient, but that she has not been able to do it "with nobody watching." The court remarked that mother did not address the children's concerns, particularly

S, who has real concern and fear about returning to mother. As relevant here, the court determined that the children could not safely be returned to mother within a reasonable time, because after two years in substitute care, they needed to achieve a sense of permanency. The court also determined that returning custody to mother would likely result in serious emotional and physical harm to the children.

Mother now appeals the resulting judgments establishing guardianships for the children.

A juvenile court may establish a guardianship under ORS 419B.366—often referred to as a "durable" guardianship—if the court has approved a plan of guardianship under ORS 419B.476 and, after a hearing, determines:

"(a)   The ward cannot safely return to a parent within a reasonable time;

"(b)   Adoption is not an appropriate plan for the ward;

"(c)   The proposed guardian is suitable to meet the needs of the ward and is willing to accept the duties and authority of a guardian; and

"(d)   Guardianship is in the ward's best interests. In determining whether guardianship is in the ward's best interests, the court shall consider the ward's wishes."

ORS 419B.366(6).

When the proceeding involves an Indian child, the juvenile court must, as relevant here, also determine, "by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent *** is likely to result in serious emotional or physical damage to the child." 25 USC § 1912(e); *see also* ORS 419B.366(4)(a)(C)(i) (requiring the court to determine, "by clear and convincing evidence, including the testimony of one or more qualified expert witnesses *** that the continued custody of the Indian child by the child's parent *** is likely to result in serious emotional or physical damage to the Indian child"). That evidence "must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular

child who is the subject of the child-custody proceeding." 25 CFR § 23.121(c); *see also* ORS 419B.366(4)(b) (requiring that the evidence "must show a causal relationship between the particular conditions in the Indian child's home and the likelihood that custody or continued custody of the Indian child will result in serious emotional or physical damage to the particular Indian child who is the subject of the child custody proceeding").

On appeal, mother argues that the juvenile court erred in establishing durable guardianships for her three children. Mother makes two arguments: (1) ODHS failed to prove, by clear and convincing evidence, that mother's custody of the children "is likely to result in serious emotional or physical damage" to the children, and (2) ODHS failed to prove, by clear and convincing evidence, that the children could not be safely returned to mother within a reasonable time.

We first address preservation. Although mother preserved her second argument in the juvenile court, mother did not adequately preserve her first argument. However, under 25 USC section 1914, a parent may bring an unpreserved ICWA challenge to a guardianship established under ORS 419B.366, when that challenge is premised on a violation of 25 USC section 1912(e). *K. C. W.*, 347 Or App at 431-32 (explaining that the mother could raise, for the first time on appeal, her argument that ODHS failed to prove a nexus between her substance abuse and the likelihood of serious emotional or physical damage to the children, as required by 25 USC section 1912(e)). Accordingly, we proceed to address both of mother's arguments on the merits.[1]

---

[1] We note that mother only cited to ORS 419B.366 in her briefing, while relying on 25 USC section 1914 to bring her unpreserved argument. Under 25 USC section 1914, a parent of an Indian child "may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title." That provision, by its terms, applies to challenges to a foster care placement, which includes a guardianship established under ORS 419B.366, based on violations of ICWA, not based on violations of ORICWA. *See K. C. W.*, 347 Or App at 431-32 (citing *Dept. of Human Services v. J. G.*, 260 Or App 500, 512, 317 P3d 936 (2014)). However, because the wording of the relevant provision in ICWA, 25 USC § 1912(e), and ORICWA, ORS 419B.366(4)(a)(C)(i), are identical, and mother relies solely on that wording and not any development of state law, we proceed to address mother's unpreserved challenge.

In her first argument, mother asserts that ODHS submitted insufficient evidence for the juvenile court to determine that mother's resumption of custody of the children was likely to result in serious emotional or physical damage to the children. Mother emphasizes that, by the time of the hearing, she had completed substance abuse treatment, had sustained sobriety for nine months, had completed anger management treatment, had ended her relationship with the father of D and M, and had completed NARA's positive Indian parenting program. She also emphasizes that the children are bonded to her and that she interacted appropriately with them. Mother argues that there was no evidence that she would expose the children to violence or that any parenting deficit she might have would lead to serious emotional or physical damage. She also argues there was no evidence of what parenting deficit the hands-on parenting program, which ODHS had emphasized as a significant omission in her work, would address.

In addressing mother's argument, we evaluate the juvenile court's findings "in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the totality of evidence in the record was legally sufficient to permit any rational juvenile court to find that it is highly likely that facts exist indicating that continued custody by the child's parent is likely to result in serious emotional or physical damage to the Indian child." *Dept. of Human Services v. A. R. E.*, 340 Or App 73, 76, 571 P3d 211 (2025). We also defer to the juvenile court's credibility findings, *id.*, which in this case were adverse to mother.

Under that standard, we affirm the juvenile court. As articulated by the witnesses, mother continued to struggle with behaviors that underlie three of the jurisdictional bases in this case: a substance abuse problem that hinders her ability to safely parent, not understanding the needs of the children and lacking parenting skills to safely parent, and having assaulted another adult in the presence of the children. The evidence supports the juvenile court's findings that, at the time of the hearing, mother did not understand the needs of the children and lacked parenting skills to parent them safely.

All three children experienced anxiety over the ups and downs of the case and were in therapy to address their emotional struggles. D in particular struggled with his emotions and D's therapist testified that a change in placement could result in D regressing to aggression and emotional dysregulation that historically included self-harm. Both S and D had told their therapists that they were not ready to go home with mother. S in particular had expressed anxiety and concerns about going home with mother, that she was fearful of mother learning of her feelings, and that she wanted to remain with Weiser. The evidence established that all three children had improved and were doing well in Weiser's care and that they had developed family, school, and tribal community connections that were important to them, the importance of which mother minimized.

Mother, by contrast, had only begun to reconnect with the children after not seeing them for a year. In those restarted visits, which occurred only one month before the guardianship hearing, S reported that mother delegated to S some of the responsibilities for parenting her siblings, responsibilities that S had been working with Weiser and her therapist to release. In testifying about her plan for the children to move to Portland with her, mother did not address S's or D's concerns, offered instead a vague transition plan of family counseling and being active in school adventures, and could not identify which school they would likely be attending, demonstrating a lack of insight into the needs of the children in transitioning them to her care in a distant city.

ODHS also put on evidence that mother continued to struggle with her emotions and aggressive behavior but was not willing to engage in mental health services. Mother's testimony showed that she lacked insight into those behaviors and how they could affect the children, having denied being aggressive in general and in her recent interaction with Kilkenny in particular, claiming it was a matter of perspective.

With regard to her substance use, mother has made important steps in addressing it. However, ODHS offered evidence that supports the juvenile court's finding that mother struggles to maintain sobriety when she is not in

a controlled setting, and that, when she is not sober, she cannot safely parent. Mother had completed inpatient treatment twice before during the course of the case but relapsed outside of that setting. As of the hearing, mother was still living in a controlled setting, having completed her outpatient treatment only two days prior to the hearing. We agree with mother that ODHS did not show that her substance use itself was "likely to result in serious emotional or physical damage to" the children at the time of the hearing; however, mother's pattern of relapse outside of a treatment setting is part of mother's behaviors that the juvenile court could, and did, consider in determining if returning the children to her custody would likely result in serious emotional or physical damage to the children.

Warnstaff testified that custody by mother would result in serious emotional or physical harm because of mother's behaviors and lack of parenting skills. Ruiz, a qualified expert for the Klamath Tribes, testified that it would be unsafe and detrimental for the children to go home with mother based on the evidence that she heard at the guardianship hearing.

Based on the totality of the evidence in the record, we conclude that the evidence was legally sufficient to permit the juvenile court to determine that it is highly likely that a resumption of custody by mother would result in serious emotional or physical damage to the children.

In her second argument, mother argues that ODHS submitted insufficient evidence to show that the children could not be safely returned to her in a reasonable time. In addition to the programs she had completed, mother argues that she was positioned to obtain housing through NAYA within one to two days and that the children did not have special needs requiring more than a minimally adequate parent to safely care for them. In particular, mother argues there was no evidence that the children's need for permanency could not wait a few more months while mother finished any remaining required services.

Under ORS 419A.004(27), a "reasonable time" is defined as "a period of time that is reasonable given a child

or ward's emotional and developmental needs and ability to form and maintain lasting attachments." Here, the evidence supports the juvenile court's findings that the children, after two years in substitute care, needed permanency. In addition to the evidence discussed above, the children's therapists testified that the children needed stability to feel safe and other evidence showed that the children were improving, making important tribal connections, and doing really well in their current placement. Warnstaff testified that mother needed more time maintaining sobriety and to address her behaviors and parenting skills before the children could be safely returned to her care. Mother had only just begun to reconnect with the children and lacked insight into the children's needs. Mother was also unresponsive to ODHS when additional visitation was offered and was not willing to engage in mental health services; she also disagreed that she was not in control of her anger or that she was aggressive. Based on this record, the juvenile court did not err in determining that the children could not be safely returned to mother in a reasonable time.

In sum, the juvenile court did not err in establishing durable guardianships for the children.

Affirmed.